Dear Dr. Smart:
You have requested an opinion of the Attorney General to examine the legality of Northwestern State University's ("NSU") use of public funds to provide facilities for equine sports and further to elucidate the parameters of NSU's potential liability arising from both its ownership of horses and its provision of stable facilities for horses privately owned by students.
 This opinion request presents two distinct legal issues:
 (1) Is it a prohibited donation of public funds for NSU to provide an equine sports program, and is it a prohibited donation of the use of public property for NSU to keep or board horses privately owned by students at its stable facilities?
 (2) Does the keeping or boarding of either university or privately owned horses, and their use by students in both supervised and unsupervised activities, alter or expand the scope of civil liability of the university for injury to students or third parties?
 ISSUE NUMBER ONE:
 IMPROPER USE OF PUBLIC FACILITIES
The constitutional norm for lawful use of public property is stated in La. Const. Art. VII, Sec. 14 (1974).
This principle ordains that transfers or uses of public property, funds, or things of value are donations prohibited by the Louisiana Constitution unless authorized by an obligation or duty arising from a valid source of law. Opinion of the Attorney General No. 90-651; City of Port Allen v. Louisiana Risk Management, et al, 439 So.2d 399 (La. 1983); Guste v. Nicholls College Foundation, 564 So.2d 682 (La. 1990).
With regard to the university's custody of horses not owned by the university, the pertinent questions is whether such boarding of privately owned animals is within the scope of the mandated constitutional and legal duties or obligations of the university.
The constitutional and legal duty of Northwestern State University is to promote and facilitate the public education of its students through all appropriate means. Guste, supra, 564 So.2d at 688. The public purpose obliged by this duty is best stated by the preamble to the education article of the Louisiana Constitution, La. Const. Art. VIII (1974), which provides as follows:
 "The goal of the public educational system is to provide learning environments and experiences, at all stages of human development, that are humane, just, and designed to promote excellence in order that every individual may be afforded an equal opportunity to develop to his full potential." (Emphasis added).
It has been established since ancient Greece that athletics, in the proper balance, are a necessary and desirable complement to academics in the educational process, both for recreation and for intercollegiate competition, is well-established in the university and college system of Louisiana. The use of public funds and facilities to provide athletic experiences for students is within the interpretation of Art. VIII, Sec. 14 contained in Guste v. Nicholls College Foundation, supra; it is authorized by the constitutional duty to provide a public education.
NSU, once authorized by law to maintain stables and facilities for the legitimate public purpose of facilitating an equine sports program, may operate those facilities by any reasonable means not prohibited by law and consistent with the public purpose of enhancing the public education of its students.
Hence, NSU might keep horses for students registered in equine courses and not charge a fee. It follows that it may charge a fee for boarding these privately owned horses to defray operating expenses if it so chooses.
The same rule applies to NSU students not registered in equine courses. Equine sports are an authorized recreational sport as well, and the university may provide stable facilities free of charge to students, or charge a fee to defray the cost of feed and care, as it may elect in its discretion. An analogy there is to the golf courses at some colleges and universities. Once you presume such facilities are within the duty of the institution to provide public education, it is within the discretion of the college or university to charge greens fees to students, registered in golf courses or simply playing for recreation, or not to charge such fees and to subsidize the costs of maintaining the golf course and program out of general university funds.
Whether NSU may board privately owned horses of high school students attending the Louisiana School of Math, Science or Arts under any circumstances, whether for a fee or not, depends upon the legal relationship between NSU and the school, and the legal obligations incidental thereto. The relevant question is, does NSU have any obligation or duty established by law to provide facilities to support the educational purpose of the high school located on its campus? If the answer is affirmative, the provision of the boarding privileges to such high school students is supported by a legal duty and therefore constitutional.
The original enabling statute for the high school authorized NSU to provide facilities and necessary services for the operation of the school. 1981 La. Acts No. 932; LSA-R.S. 17:1963. This authority was removed when the enabling statute was amended in 1982. 1982 La. Acts No. 151; LSA-R.S.17:1963.
As the result of the 1982 amendment to the enabling statute, NSU has no legal obligation or duty to provide use of such facilities free of charge to board or keep horses owned by students of the Louisiana School of Math, Science, and Arts. However, the facilities are legally authorized and NSU has discretion as to their use, so long as the use of the facilities is not gratuitously provided and does not pre-empt their primary use by NSU students. NSU may board horses owned by the high school students, but it must charge a fee which realistically and fairly defrays the actual cost of such use of the stable facility, so that the use of the stables will not be a donation prohibited by La. Const. Art. VII, Sec. 14 (1974).
LIABILITY FOR ANIMALS
The second part of your opinion request addresses the potential liability of NSU for the injury or death of students or others caused by horses whether owned by NSU or of which it is custodian.
Liability may arise for NSU in either capacity — as owner or as custodian of the animal causing damage.
 Article 2321 of the Louisiana Civil Code provides in pertinent part:
 "The owner of an animal is answerable for the damage he has caused . . . . "
In Holland v. Buckley, 305 So.2d 113 (La. 1974), the Louisiana Supreme Court interpreted this provision of the Civil Code to ordain the following doctrine of liability:
 "We hold, therefore, that the correct interpretation of Civil Code Article 2321 is as follows: When a domesticated animal harms another, the master of the animal is presumed to be at fault. The fault so provided is in the nature of strict liability, as an exception to or in addition to any ground of recovery on the basis of negligence, Article 2316. The owner may exculpate himself from such presumed fault only by showing that the harm was caused by the fault of the victim, by the fault of a third person for whom he is not responsible, or by a fortuitous event."
 * * * *
 The underlying reason for the owner's liability is that, as between him who created the risk of harm and the innocent victim thereby injured, the risk-creator should bear the loss. He maintains the animal for his own use or pleasure.
Article 2321 places the master of the animal under a legal obligation to keep his animal under such guard that it does no damage to others. A fault in this obligation to control the animal and guard others from harm by it entitles the victim to recover damages thereby sustained." Holland,305 So.2d at 119.
Holland remains a viable interpretation of the Louisiana Civil Code. It ordains that NSU is strictly liable for any injuries or deaths caused by horses owned by it. This is ameliorated somewhat by a right to partial indemnification for NSU when a horse owned by it is in the custody of another when the injury or death occurs (discussed infra). Otherwise, when NSU is the owner of a horse causing damage, it may totally vitiate its liability only if it can prove, as an affirmative defense, that the injury, damage or death was caused: (1) by victim fault, (2) by third person fault, or (3) by a fortuitous event.
Strict liability may also be imposed upon a non-owner custodian of an animal for damages caused by the animal. Hence, NSU may be held strictly liable for harms caused by horses owned by NSU or high school students, the custody of which it has accepted through a contract to keep or board the animal. La. Civ. Code Art. 2317 provides:
 "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
In Loescher v. Parr, 324 So.2d 441 the Supreme Court ruled the doctrine of strict liability, based upon an interpretation of La. Civ. Code Art. 2317, obtained not only as an incident of ownership of an animal, but also resulted from the actual custody of "things" (which includes animals). The Supreme Court ruled in Loescher:
 "The principle of legal fault thus recognized under Articles 2318, 2320, 2321, and 2322 — and indicated as applicable under Article 2319 -, it is argued, should also be held to apply to the liability under Article 2317 of the guardian (in this case, the owner) of a thing for damages caused by its defect."
 To summarize the principle of legal fault thus already recognized in favor of an injured person himself without fault:
 When harm results from the conduct or defect of a person or thing which created an unreasonable risk of harm to others, a person legally responsible under these code articles for the supervision, care or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the former's part is proved. The liability arises from his legal relationship to the person or thing whose conduct or defect created an unreasonable risk of injuries to others.
 The fault of the person thus liable is based upon his failure to prevent the person or thing for whom he is responsible from causing such unreasonable risk of injury to others. Thus, the person to whom society allots the supervision, care or guardianship (custody) of the risk-creating person or thing bears the loss resulting from creation of the risk, rather than some innocent third person harmed as a consequence of his failure to prevent the risk. This fault rests upon his failure to prevent the risk-creating harm and upon his obligation to guard against the condition or activity (by the person or thing for which he is responsible) which creates the unreasonable risk of harm to others." Loescher, 324 So.2d at 446. (Emphasis original).
While states entities and agencies are not exempt from the strict liability imposed by La. Civ. Code Art. 2317, McNeal v. Division of State Police, 412 So.2d 1124 (La.App. 1st Cir. 1982), the scope of this liability for governmental entities has been substantially limited to 1985 La. Acts No. 454, enacting LSA-R.S. 9:2800.
Act No. 454 limits the strict liability under Art. 2317 for public entities for damages caused by the vice or defect of things in their custody, by requiring proof that the public entity had actual or constructive knowledge of the particular vice or defect. This transmutes the strict liability of public entities, under Art. 2317 at least if not under Art. 2321, into a cause of action analogous to an action in negligence. See Limiting Strict Liability of Governmental Defendants: The Notice Requirement of the 1985 Legislation, 46 Louisiana Law Review 1197 (1986).
Accordingly, NSU is liable for harms caused by horses within its custody and control, but not owned by it, only if it had knowledge of facts regarding the animal's propensity or predisposition for causing that type of harm sufficient to give it actual or constructive notice of the "vice or defect" in the animal. Because of R.S. 9:2800, the burden of proof for a plaintiff to establish liability under Art. 2317 is much more onerous than the liability under Art. 2321, which simply flows from the fact of ownership. Hence, NSU's exposure to liability for harms caused by privately owned animals is substantially less than its exposure for harms caused by horses owned by the University, unless NSU has actual or constructive notice of some propensity of the privately owned animal to cause harm.
The next question is how liability is to be apportioned when ownership and custody of the animal causing harm is divided between two persons. For the purpose of this analysis, it will be presumed that R.S.9:2800's notice requirement is satisfied by the facts and circumstances of NSU's custody.
The Supreme Court in Rozell v. Louisiana Animal Breeders Co-op,496 So.2d 275 (La. 1986) found that Articles 2317 and 2321 created independent bases for liability, and that the legal relationship provided by either custody or ownership established liability. Art. 2317 was not to be "grafted" upon Art. 2321, adding custody as an additional requirement to ownership in order for there to be strict liability.
Rozell further held the liability of the owner of the animal to be primary to the liability of the custodian if the owner places the animal in the custody of another. The owner in such a case may be entitled to indemnification from the actual custodian. Rozell, 496 So.2d at 278. The court did not elaborate upon the basis or measure of such indemnification, but it is suggested that the principles of solitary obligations would apply, and the owner could recover his virile share from the actual custodian.
Hence where the student injured is the owner of the horse, but the horse is in the custody and control of NSU through contract with the student, any obligation arising from Art. 2317 and 2321 is extinguished by the principle of confusion. La. Civ. Code Art. 1903 et seq. The injured student is both obligor and obligee at once. The same result occurs when the horse is owned by NSU, but the student has become its custodian by removing the horse from the custody and control of NSU. The qualities of obligor and obligee are united in the same person if the student/custodian is injured, and the obligation of the owner is extinguished to the extent of the student's virile share due to confusion. La. Civ. Code Art. 1905.
Contributory negligence is not a defense to a strict liability cause of action arising under Articles 2317 and 2321. Rozell, supra, at 279. Generally the most germane defense to these types of strict liability claims will be victim fault affirmative defenses.
Originally victim fault, in the Loescher and Holland conceptuality, was presented as a defense to liability. Rozell defined victim fault to mean that "the conduct of the victim was a substantial factor in causing the injury complained of" [citing Ruffo v. Schwegmann Brothers Giant Supermarkets, Inc., 424 So.2d 470, 473 (La.App. 5th Cir. 1982)]. Where victim fault rose to the level of causation in fault, it barred liability totally. Rozell, supra, at 279.
Subsequent to Rozell, the legislative amended La. Civil Code Art. 2323
to establish the doctrine of comparative fault. This transmuted the idea of victim fault from an affirmative defense in Articles 2317 and 2321 strict liability cases into a criteria for the mitigation of damages by the obligor.
In Howard v. Allstate Ins. Co., 520 So.2d 715 (1988) the Supreme Court reconciled the victim fault defense of Loescher and Holland with the comparative fault provisions of Art. 2323 by redefining victim fault as "comparative causation." The court stated:
 "However, there is a problem with applying comparative fault to a strict liability case. Strict liability is based on a theory of responsibility which required no finding of negligence. The "fault" of the defendant does not involve blame-worthiness or culpability. The theory of strict liability does not lend itself to a comparison of culpability. If a defendant liable under a strict liability rule can mitigate damages by showing the plaintiff's negligence, then the plaintiff will be forced to show the defendant's culpability in order to lessen by comparison his own. This inappropriately reintroduces the element of negligence into a strict liability action. There is also the conceptual difficulty of comparing the two types. We agree with the court of appeal that the most satisfactory result to this problem seems to be the principle of comparative causation. Under this principle, the fault-finder compares the causal effect of the plaintiff's conduct with that of the defendant's non-negligent fault . . . .
 Thus, the extent to which each party contributed to the damages should be the measure by which the loss is apportioned." (Emphasis added).
Where NSU is either the owner or custodian of a horse causing harm, and the injured party is neither, the damages due to the injured party by reason of NSU's strict liability may be reduced by the measure by which the victim's fault or negligence contributed to the cause of the harm suffered. However, it must be reemphasized that the comparative fault doctrine of Civ. Code Art. 2323 does not nullify the strict liability imposed by Loescher and Holland upon NSU. It applies only to the apportionment of damages. Howard, supra, at 718.
With particular regard to Holland's comparative definition of victim fault with regard to injuries sustained in the riding of horses, an earlier case identifies two criteria of possible relevance to the issue of the plaintiff's contribution to the harm suffered. These are (1) the experience of the rider, and (2) whether the ride was voluntary or mandated. Roberts v. Hartford Acc. Sec. Indem. Co., 394 So.2d 696, 697 (La.App. 3rd Cir. 1981). These criteria are, however, merely illustrative but not exhaustive.
 To summarize the conclusions of this opinion:
 (1) The use of public funds and property by NSU to provide facilities for an equine sports program for academic, athletic and recreational purposes does not violate La. Const. Art. VII, Sec. 14 (1974).
 (2) The boarding of horses privately owned by students, does not violate Art. VII, Sec. 14 (1974), and it is within the university's discretion either to charge or not to charge a fee for boarding to students.
 (3) The boarding of horses owned by students of the Louisiana School of Math, Science and the Arts is not a prohibited donation of the use of public facilities provided a reasonable boarding fee is charged which is proportionate to the cost to NSU for keeping the animal. This fee should contemplate the cost of insurance as well as food, grooming, and veterinary care.
 (4) NSU is strictly liable without negligence for harms caused by horses owned by it.
 (5) NSU is strictly liable for harms caused by horses not owned by it but within its custody, control and guardianship, when it has actual or constructive notice of the animal's propensity for causing that harm.
 (6) Where the victim of the harm is also the private owner of the horse causing the harm, the tortious obligation of NSU is extinguished by the principle of confusion even if NSU is the custodian of the horse, and even if it had notice.
 (7) Where the horse is owned by a student but in the custody of NSU, and injures a third party, the student is strictly liable for damages but may seek indemnification from NSU as a solitary obligor in the amount of its virile share, if it can prove NSU had the notice required by R.S. 9:2800.
 (8) Where the horse is owned by NSU but removed from its custody and control by a student or another, and injures a third party, NSU is strictly liable for damages but may seek indemnification from the custodian as a solitary obligor in the amount of his or her virile share.
 (9) Where the horse is both owned and in the custody of NSU, and causes harm to a student or another, the measure of damages due under NSU's strict liability may be reduced if the harm was caused by victim fault.
 (10) Victim fault is the determination of causation, i.e., to what extent did the victim's conduct contribute to the harm suffered?
 (11) Two illustrative, but not exclusive, criteria for evaluating victim fault with regard to injuries caused by horse riding are (1) whether the victim rode the horse volitionally, and (2) the experience of the victim in horse riding.
Trusting this to be of sufficient information, I am
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: NORMAN W. ERSHLER Assistant Attorney General
NWE/vls-1589o